Matthew J. Langley, California Bar No. 342846
ALMEIDA LAW GROUP LLC
849 W. Webster Avenue
Chicago, Illinois 60614
t: 312-576-3024
matt@almeidalawgroup.com

*Attorney for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MADELINE DION, *individually and on behalf of all others similarly situated,* | Case No.: 2:24-cv-6562 |
| Plaintiff, vs. | **CLASS ACTION COMPLAINT** |
| OXFORD HOTELS AND RESORTS, LLC d/b/a THE GODFREY HOTEL HOLLYWOOD and AMADEUS HOSPITALITY, INC. d/b/a TRAVELCLICK, | **FOR:** |
| Defendants. | 1. **Violation of the California Invasion of Privacy Act, Cal. Penal Code § 631(a)** |
| | 2. **Violation of the California Invasion of Privacy Act, Cal. Penal Code § 632** |
| | **JURY TRIAL DEMANDED** |

1

## CLASS ACTION COMPLAINT

1.      Plaintiff Madeline Dion ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Oxford Hotels and Resorts, LLC d/b/a The Godfrey Hotel Hollywood ("Godfrey") and Amadeus Hospitality, Inc. d/b/a TravelClick ("TravelClick" and together with Godfrey, "Defendants"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## INTRODUCTION

2.      The Godfrey Hotel Hollywood is a boutique hotel owned by Oxford Hotels and Resorts and located in Los Angeles, one block south of Sunset Boulevard, with 220 guestrooms.[1]

3.      In order to market its services, Godfrey owns and controls a website, https://www.godfreyhotelhollywood.com/ (the "Website").

4.      TravelClick is a hospitality global provider that provides cloud-based solutions, including an independent and mid-size hotel Central Reservation System and Guest Management Solution, as well as business intelligence and media solutions.[2]

5.      TravelClick's booking solutions cloud-based platform, located at bookings.travelclick.com ("TravelClick Platform" and, together with the Website, "Web Properties"), is provided to hotels to allow guests to book directly from a hotel website.[3]

---

[1] *See* https://www.godfreyhotelhollywood.com/.

[2] *See* https://www.amadeus-hospitality.com/insight/amadeus-completes-acquisition-of-travelclickamadeus-completes-acquisition-of-travelclickamadeus-completes-acquisition-of-travelclickamadeus-completes-acquisition-of-travelclick/.

[3] *See* https://www.hotel-online.com/press_releases/release/travelclick-launches-

6.      When guests like Plaintiff make reservations on a hotel website that employs the TravelClick Platform, like Godfrey's Website, guests are redirected to the TravelClick booking Platform which allows those guests to choose the dates of their stay, hotel room and rate, before providing their payment information and completing their reservation.

7.      However, unbeknownst to them, any guest who books a hotel reservation on Godfrey's Website, which employs the TravelClick Platform, has their personally identifiable information ("PII")—including information that identifies them as guests, boarders, occupants, lodgers, customers, or invitees of a hotel—and unlawfully discloses it to third parties including Meta Platforms, Inc. ("Facebook") and Google, Inc. ("Google").

8.      This unlawful disclosure occurs because Defendants installed third-party tracking technologies such as the Meta Pixel ("Facebook Pixel" or "Pixel") as well as Google Analytics and Google Tag Manager ("Tracking Tools") onto their Website and/or the TravelClick Platform.

9.      The Meta Pixel tracks and collects communications with the Defendants via the Website and/or the TravelClick Platform and surreptitiously forces the user's web browser to send those communications to undisclosed third parties, such as Facebook and/or Google.

10.     Importantly, alongside the guest information, the Pixel also disclosed Plaintiff's and Class Members' personal identifiers, including customers' IP address and cookie values such as their unique Facebook ID, thereby allowing individual customers' communications with Defendants, and their guest information contained in those communications, to be linked to their unique Facebook accounts

---

new-responsive-booking-engine-4-0-maximizing/.

CLASS ACTION COMPLAINT

11.     Specifically, the Pixel uses cookies to disclose a guest's Facebook ID that is linked to their Facebook profile and contains a wide range of demographic and other information about the guest, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook can easily use the Facebook ID to quickly and easily locate, access, and view the user's corresponding Facebook profile.

12.     Similarly, Google "stores users' logged-in identifier on non-Google websites…in its logs … Whenever a user logs-in on non-Google websites, whether in private browsing mode or non-private browsing mode, the same identifier is associated with the data Google collects from the user's browsing activities on that website. Google further logs all such data (private and non-private) within the same logs and uses these data for serving personalized ads."[4]

13.     Defendants aid, employ, or otherwise enable a third party, Facebook and/or Google, to eavesdrop on communications sent and received by Plaintiff and Class Members, including communications that contain sensitive and confidential information (i.e., "guest records," as defined by California Civil Code § 53.5).

14.     By failing to procure consent before enabling Facebook and Google's interception of these communications, Defendants violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

---

[4] *See Brown v. Google LLC*, Case No. 4:20-cv-3664-YGR, 2023 WL 5029899 (N.D. Cal. Aug. 7, 2023) (order denying summary judgment and citing internal evidence from Google employees).

CLASS ACTION COMPLAINT

**PARTIES**

15.    Plaintiff Madeline Dion is, and at all relevant times has been, a resident Los Angeles, California.

16.    Defendant Oxford Hotels and Resorts, LLC d/b/a The Godfrey Hotel Hollywood is a Delaware corporation with its principal place of business and corporate headquarters at 350 W. Hubbard Street, Suite 440, Chicago, IL 60654.

17.    Defendant Amadeus Hospitality, Inc. d/b/a TravelClick is a Delaware corporation with its principal place of business and corporate headquarters at 75 New Hampshire Avenue, # 300, Portsmouth, NH 03801.

**JURISDICTION AND VENUE**

18.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class is a citizen of a state different from Defendants.

19.    The Court has personal jurisdiction over Defendants because they regularly engage in business in the State of California and in the County of Los Angeles, and a substantial portion of the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this county.

20.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because: a substantial part of the events giving rise to this action occurred in this District, including the unlawful disclosure of PII that injured Plaintiff and the purported Class Members.

**PLAINTIFF ALLEGATIONS**

21.    On or around September 25, 2021, Plaintiff Dion visited the Web Properties operated by Defendants on the same browser that she used to access Facebook.

CLASS ACTION COMPLAINT

22.    Plaintiff Dion was in California when she visited the Website.

23.    Plaintiff accessed the Web Properties on her computer and mobile devices.

24.    Upon accessing the Website, Plaintiff Dion browsed and booked a hotel room at the Godfrey.

25.    Each of the communications Plaintiff sent to Defendants was intercepted in transit by Facebook—as enabled by Defendants—as well as by Google, including communications that contained Plaintiff Dion's confidential "guest records," as defined by Cal. Civil Code § 53.5.1.

26.    Neither Defendants nor Facebook or Google procured Plaintiff Dion's consent prior to this interception and/or disclosure.

27.    Plaintiff, in using the Web Properties, provided her PII and information regarding her "guest record" including her name, her destination, the dates of her stay, the type of room she stayed in, and the rate of that room. Defendants also transmitted Plaintiff's Facebook ID, computer IP address and other device and unique online identifiers to Facebook and Google.

28.    Plaintiff has used and continues to use the same devices to maintain and access an active Facebook account throughout the relevant period in this case.

29.    Plaintiff and Class Members has suffered injury as a result of Defendants' conduct. These injuries include (i) invasion of privacy, (ii) loss of the benefit of the bargain, (iii) diminution of value of the disclosed Private Information, (iv) statutory damages, (v) mental distress, and (vi) the continued and ongoing risk of further disclosure of their Private Information.

## COMMON FACTUAL ALLEGATIONS

### I. The California Invasion of Privacy Act

30.    The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens. The legislature expressly

CLASS ACTION COMPLAINT

recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Penal Code § 630.

31.    The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call.*" *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

32.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.

> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Id.* at 360-61 (emphasis added) (internal citations omitted).

33.    As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any … communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use … any information so obtained."

CLASS ACTION COMPLAINT

34.   CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

35.   As part of CIPA, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

36.   A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto." Cal. Penal Code § 632(c).

37.   Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation. Cal. Penal Code § 637.2(a)(1). Plaintiff does so, here, against Defendants.

**II. California Civil Code § 53.5**

38.   As the California Legislature recognized, a "guest record" maintained by an owner or operator of an inn, hotel, motel, lodging house, or other similar accommodations is confidential. Such an owner or operator "shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order." Cal. Civil Code § 53.5(a).

39.   Per Cal. Civil Code § 53.5(c):

> "Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of

birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile license plate number.

40. Further, the legislative history of § 53.5 indicates:

(a) In 1972, California voters amended the California Constitution to include the right of privacy among the "inalienable" rights of all people. The amendment established a legal and enforceable right of privacy for every Californian. Fundamental to this right of privacy is the ability of individuals to control the use of their personal information.

(b) Since California voters approved the right of privacy, the California Legislature has adopted specific mechanisms to safeguard consumer privacy, including the California Consumer Privacy Act of 2018, the Online Privacy Protection Act, the Reader Privacy Act, the Privacy Rights for California Minors in the Digital World Act, and Shine the Light, a California law intended to give Californians the 'who, what, where, and when' of how businesses handle consumers' personal information.

(c) Californians frequently have to disclose their sensitive personal information to third parties in order to accomplish routine activities: apply for a job; apply for housing; raise a child; drive a car or take transportation; or stay at a hotel or motel.

(d) California law has not kept pace with these developments and the personal privacy implications surrounding the collection, use, and protection of personal information by third parties.

(e) Many businesses collect personal information from California consumers. They may know where a consumer lives, how many children a consumer has, where a consumer lives and works, where a consumer travels and where they stay on their trip, how fast a consumer drives, a consumer's personality, sleep habits, biometric and health information, financial information, precise geolocation information, and social networks, to name a few categories.

(f) The unauthorized disclosure of personal information and the loss of privacy can have devastating effects for individuals, including financial fraud, identity theft, unnecessary costs to personal time and finances, destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.

(g) When Californians leave their homes to travel via bus or stay at lodging establishments throughout their state, they desire assurances that these businesses will respect

CLASS ACTION COMPLAINT

their privacy and safeguard their personal information from improper disclosure.

(h) Protecting the privacy of personal information promotes consumer confidence and encourages both residents and visitors to travel to and within California and to patronize California businesses.

(i) Therefore, it is the intent of the Legislature to further Californians' right to privacy by ensuring that the personal information disclosed by patrons of lodging establishments and bus companies is used for the intended business purposes and not improperly disclosed.

California S.B. 1194 (September 27, 2018).[5]

41.    Here, users' communications with Defendants—made while browsing and booking via the Web Properties—contain sensitive and confidential "guest records," as defined by Cal. Civil Code § 53.5.

42.    The communications include "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).

43.    The Facebook Pixel compels Web Properties users' browsers to transmit cookies (including the c_user, datr, fr, and _fbp cookies) containing "unique identifying number[s]" assigned to users of the Web Properties. Cal. Civil Code § 53.5(c). These communications are all "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).

44.    Similar to Facebook. information sent to Google was sent alongside the Plaintiff's and Class Members' unique identifier ("_ga" or "CID" cookies) , thereby allowing individual customers' communications with Defendants, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.

---

[5]https://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201720180SB1194.

CLASS ACTION COMPLAINT

### III. Defendant's Tracking Tools, as Enabled by Defendants, Wiretaps Californians' Communications, in Violation of CIPA

#### A. Overview of Facebook's Advertising Platform and the Facebook Pixel

45.     Facebook refers to itself as a "real identify platform,"[6] meaning users are allowed only one account and must share "the name they go by in everyday life."[7] To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[8]

46.     As recently as 2021, Facebook generated over $100 billion in annual revenue.[9] Roughly 97% of that came from selling advertising space.[10]

47.     Facebook sells advertising space by highlighting its ability to target users.[11] Facebook can target users so effectively because it surveils user activity both on and off its site.[12] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behaviors," and "demographics."[13] Facebook complies this information into generalized dataset

---

[6] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[7] FACEBOOK, COMMUNITY STANDARDS: ACCCOUNT INTERGRITY AND AUTHENTIC IDENTIY, https://transparency.meta.com/policies/community-standards/account-integrity-and-authentic- identity/.

[8] FACEBOOK, SIGN UP, https://www.facebook.com/signup.

[9] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-%2022Full-Year-2021-Results/default.aspx.

[10] *Id.*

[11] FACEBOOK, WHY ADVERISTE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[12] FACEBOOK, ABOUT META PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[13] FACEBOOK, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting.

CLASS ACTION COMPLAINT

called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[14]

48.     Advertisers can build "Custom Audiences."[15] Custom Audiences enables advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[16] With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience and find new people who share similar qualities."[17]

49.     Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data. They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools,"[18] including the Facebook Pixel, as described *supra*.

50.     As Facebook puts it, the Business Tools "help website owners and

---

[14] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[15] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

[16] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[17] FACEBOOK, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[18] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/17045684314556; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

CLASS ACTION COMPLAINT

publishers, app developers and business partners, including advertisers and others, integrate with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[19]

51.    Put succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

52.    The Business Tools are configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user makes a purchase.[20] However, Facebook's Business Tools can also track other events.

53.    Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[21] Advertisers can even create their own tracking parameters by building a "custom event."[22]

54.    One such Business Tool is the Facebook Pixel. Facebook offers this piece of code to advertisers, like Defendants, to integrate into their websites.

55.    As the name implies, the Facebook Pixel "tracks the people and the types of actions they take."[23] When a user accesses a website hosting the Facebook Pixel, Facebook's software surreptitiously directs the user's browser to simultaneously send a separate message to Facebook's servers. This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect. This transmission is initiated by Facebook code and concurrent with the communications with the host website. Two sets of code are thus automatically

---

[19] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

CLASS ACTION COMPLAINT

run as part of the browser's attempt to load and a website: the website's own code, and Facebook's embedded code.

56.    An individual who navigates to the Web Properties and clicks on a button to browse Defendants' offerings sends a GET request to Defendants' server requesting that server to load the particular webpage.

57.    Because Defendants utilize the Facebook Pixel, Facebook's embedded code, written in JavaScript, sends instructions back to the individual's browser, without alerting the individual that this is happening. Facebook causes the browser to secretly and simultaneously duplicate the communication with Defendants, transmitting it to Facebook's servers alongside additional information that transcribes the communication's content and the individual's identity. This entire process occurs within milliseconds.

58.    When a user communicates with Defendants' Web Properties, those communications are simultaneously and contemporaneously duplicated and sent to Facebook at the same time as they are sent to Defendants. Thus, Facebook's interception of these communications occurs "in transit*." See, e.g.*, *In re*

---

[20] *See* FACEBOOK, META PIXEL GUIDE: ADVANCED, https://developeers.facebook.com/docs/facebook-pixel/advanced/; *see also* FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142%3B; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[21] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[22] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142%3B.

[23] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

CLASS ACTION COMPLAINT

*Facebook Internet Tracking Litig.*, 956 F.3d 4 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…").

59.    After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

60.    Facebook's other Business Tools function the same. For mobile applications, advertisers can utilize the Facebook SDK, which contains components like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[24]

61.    Advertisers can also utilize the Facebook Business Tool called "Conversions API." Rather than tracking users using Pixels that rely on cookies (via browser Pixel events), the Conversions API enables tracking directly through advertisers' website servers (via server events).[25] Thus, the Conversions API's tracking capabilities are not impacted by a consumer's browser setting, cookies opt-outs, or device-specific privacy controls.[26]

---

[24] FACEBOOK, APP EVEENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.
[25] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api ("The Conversions API is designed to create a connection between an advertiser's marketing data . . . from an advertiser's server, website platform, mobile app, or CRM to Meta systems[.]").
[26] TUEROIS, DECODING CONVERSIONS API AND PRIVACY IMPLICATIONS, https://tueoris.com/privacy/decoding-conversions-api-and-privacy-implications/.

CLASS ACTION COMPLAINT

62.     Additionally, the Conversions API collects "customer information parameters sent with [] server event[s]"[27] so that those server events data points may be "matched to users"[28]—including "people who are more likely to take the action [advertisers] care about[.]"[29]

63.     When the Conversion API collects "[s]erver events," those data points are "linked to a dataset ID and are processed like events sent using the Meta Pixel[.]"[30] As with the Facebook Pixel, the Conversions API intercepts those communications contemporaneously and surreptitiously.[31] Facebook "recommend[s] that advertisers implement the Conversion API alongside their Meta Pixel."[32]

64.     Facebook confirms, in its "Meta Business Tools Terms,"[33] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendants. For instance, Facebook can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to

---

[27] FACEBOOK, BEST PRACTICES FOR CONVERSION API, https://www.facebook.com/business/help/308855623839366?id=818859032317965.

[28] FACEBOOK, CONVERSIONS API: VERIFYING YOUR SETUP, https://developers.facebook.com/docs/marketing-api/conversions-api/verifying-setup.

[29] FACEBOOK, ABOUT EVENT MATCH QUALITY, https://www.facebook.com/business/help/765081237991954?id=818859032317965.

[30] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.

[31] FACEBOOK, CONVERSIONS API END-TO-END IMPLEMENTATION, https://developers.facebook.com/docs/marketing-api/conversions-api/guides/end-to-end-implementation/ ("send events in real time . . . via the Conversions API").

[32] Id.

[33] FACEBOOK, META BUISNESS TOOLS TERMS, https://www.facebook.com/legal/businesstech?_rdr.

CLASS ACTION COMPLAINT

provide and improve the Meta Products." In other words, Facebook can use the wiretapped information for its own "research and development," and well as to "protect" its own products and services.

65.    Facebook can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[34]

66.    Further, Facebook can use the event data to help websites like Defendants' "reach people with transactional and other commercial messages on [Facebook] Messengers and other Meta Products."[35]

67.    Finally, Facebook can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[36]

68.    Thus, Facebook has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendants, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

**B.    Facebook, As Enabled By Defendants, Intercepts Californians' Communications**

69.    Defendant Godfrey owns and, together with Defendant TravelClick, operates the Website which utilizes the TravelClick booking Platform.

[34] *Id.*
[35] *Id.*
[36] *Id.*

CLASS ACTION COMPLAINT

Defendants have integrated the Facebook Pixel into these Web Properties.

70. On the Web Properties, users can browse and book a reservation at the Godfrey and in doing so, those users are required to provide Defendants with confidential information including "guest information" identifying users of the Web Properties as guests of the hotel, disclosing the dates of their stay, the type of room they book, the number of guests, and other protected information.

71. Unbeknownst to Plaintiff and Class Members, however, Defendants aid, agree with, employ, or otherwise enable Facebook to eavesdrop on those confidential communications using Facebook's Business Tools such as the Pixel and Conversions API.

72. Users' confidential communications are the product of Web Properties users affirmatively entering, and interacting with, information on the Web Properties (*i.e.,* the confidential communications are not procedurally or automatically generated). Instead, as set out below, the confidential communications stem from Web Properties users typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Web Properties users' communicative inputs; information created by and in response to Web Properties users' intended messages to the Web Properties and Defendants; and information created by and in response to Web Properties users' having conveyed and expressed their respective desires that the Web Properties would supply them with certain, highly personalized, types of information and/or responses.

73. When auser browses and books a hotel room at the Godfrey Hotel Hollywood on the Web Properties, they select the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, and the number of adults and children who will be traveling. Facebook, as enabled by

Defendants, contemporaneously intercepts a Web Properties user's button clicks selecting such items—using the Facebook Pixel:

CLASS ACTION COMPLAINT

74.    As shown by the highlights in this excerpt of the Website's transmissions, beginning at the top, Defendants configured the Facebook Pixel number 391474022466070 to disclose, via the "InitiateCheckout" event, the specific details of users' confidential "guest records."

75.    The    Pixel    discloses    the    previous    webpage ("https://godfreyhotelhollywood.com), the Check-in date (2024-07-16), the Check-out date (2024-07-17), the destination (The Godfrey Hotel Hollywood), the room type (Partial Accessible King with Tub) and even the purchase value ($245).

76.    Defendants disclose to Facebook a number of events, sharing the details of a guest's interactions with the Web Properties as they progress through the process of booking and purchasing a hotel room, including the "SubscribedButtonClick" event which discloses when users "click on something the pixel detects as a button or link[,]" along with "the button or link's text."[37]

77.    Through this event, Facebook intercepts the destination (the Godfrey), the date of the trip, the number of adults, the number of children, and the fact that the guest clicked the "book" button and booked the room.



_____

[37] HACKERNOON, HOW TO FIX YOUR ORGANIZATION'S META PIXEL PROBLEM, https://hackernoon.com/how-to-fix-your-organizations-meta-pixel-problem.

CLASS ACTION COMPLAINT

78.     As the guest progresses through the booking process, Defendants allow Facebook to intercept the details of the users' "guest records," using the "Purchase" event to confirm a guest's purchase of the hotel room:



79.     Along with disclosing that the room had been purchased, the "Purchase" event also discloses the destination, how many rooms were booked, how many adults were in the room, the check in and check out dates, the type of room and how much the room cost. These events allowed Facebook to track a guest's interactions with the Web Properties from the initiation of the reservation all the way through the purchase of the room.

**C.     Defendants Enable Facebook to Pair Event Data with a User's Identity**

80.     Along with the foregoing, Facebook Pixels—as enabled by Defendants—pair event data with a user's Facebook ID. Facebook does this through cookies.

81.     A cookie is a "small text file (up to 4KB) created by a website that is stored in the user's computer either temporarily for that session only or

21

CLASS ACTION COMPLAINT

permanently in storage (persistent cookie)."[38] Among other things, persistent cookies can be used to "track user behavior across different sites. They store information such as geographic location, device specifications, and specific actions taken on the website."[39]

82.    Facebook "place[s] cookies on [a person's] computer or device and receive[s]  information stored in [those] cookies when [said person] use[s] or visit[s]: [] Meta Products [(i.e.,  Facebook, Messenger, Instagram, etc.)]; [and] Products provided by other members of the Meta  Companies; and Websites and apps provided by other companies that use the Meta Products, including companies that incorporate Meta technologies [(i.e., the Facebook Business Tools)] into their websites and apps."[40]

83.    Thus, in short, Facebook places cookies on a user's computer that allow Facebook to follow a user's surfing behavior across other websites which have implemented a Facebook Pixel or other Facebook component.[41]

**Request Cookies**    ☐ show filtered out request cookies

| Name ▲ | Value | Domain | Path | Ex... | Size | Htt... | Sec... | Sa... | Par... |
|---|---|---|---|---|---|---|---|---|---|
| c_user | 61560564045991 | .facebook.com | / | 20... | 20 | | ✓ | No... | |
| datr | h9WCZnuMq3rUaBLLpzpNn... | .facebook.com | / | 20... | 28 | ✓ | ✓ | No... | |
| dpr | 1.5 | .facebook.com | / | 20... | 6 | | ✓ | No... | |
| fr | 16NLeDjiT6Y9ZNT2k.AWW7... | .facebook.com | / | 20... | 82 | ✓ | ✓ | No... | |
| locale | en_US | .facebook.com | / | 20... | 11 | | ✓ | No... | |
| ps_n | 1 | .facebook.com | / | 20... | 5 | ✓ | ✓ | No... | |
| sb | h9WCZqatviXVCm_wXMDL4... | .facebook.com | / | 20... | 26 | ✓ | ✓ | No... | |
| xs | 37%3APDHxTl5Wsp3gYg%3... | .facebook.com | / | 20... | 96 | ✓ | ✓ | No... | |

[38] PC MAGAZINE, COOKIE, https://pcmag.com/encyclopedia/term/cookie.
[39] COOKIEBOT, WHAT ARE TRACKING COOKIES AND HOW DO THEY WORK?, https://www.cookiebot.com/en/tracking-cookies/.
[40] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/privacy/policy/.
[41] *See, e.g.,* Paschalis Bekos et al., *The Hitchhiker's Guide to Facebook Web Tracking with Invisible Pixels and Click IDs* (Apr. 2023) https://dl.acm.org/doi/pdf/10.1145/3543507.3583311.

22

CLASS ACTION COMPLAINT

84. When a user accesses the Web Properties while logged into Facebook, the Pixel will compel that user's browser to transmit several cookies, including the c_user, datr, and fr cookies:[42]

85. The c_user cookie contains, at least, the user's unencrypted Facebook ID.[43] The c_user cookie has a lifespan four hundred days.[44]

86. The datr cookie contains, at least, a value that uniquely identifies a browser.[45] The datr cookie has a lifespan of four hundred days.[46]

87. The fr cookies contains, at least, a value that uniquely identifies a browser and the user's encrypted Facebook ID.[47] The fr has a lifespan of ninety days.[48]

---

[42] Note that the Facebook Pixel uses both first- and third-party cookies. A first-party cookie is "created by the website the user is visiting"—i.e., the Website. PC MAGAZINE, FIRST-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/first-party-cookie. A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—i.e., Facebook. PC MAGAZINE, THIRD-PARTY COOKIE, https://www.pcmag.com/encyclopedia/term/third-party cookie. The _fbp cookie is always transmitted as a first-party cookie. A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook. Pictured here is the _fbp cookie, sent as a first-party cookie.

[43] MICROSOFT, COOKIE COMPLIANCE, https://learn.microsoft.com/en-us/dynamics365/commerce/cookie-compliance ("Cookie[:] c_user[.] Description[:] Cookie contains the user ID of the currently signed-in user.").

[44] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[45] Id. ("'Datr' is a unique identifier for your browser[.]").

[46] Id.

[47] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012), http://www.europe-v-facebook.org/ODPC_Review.pdf ("The first part of the cookie is a browser ID, used to identify the web browser. The second part of the cookie is an encrypted version of the logged in user's Facebook ID.").

[48] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

CLASS ACTION COMPLAINT

88.     When a website visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies including datr, and fr cookies. No matter the circumstances, Facebook compels the visitor's browser to transmit the fr and _fpb cookies:

89.     Facebook, at a minimum, uses c_user, datr, and fr cookies to link Facebook IDs and corresponding Facebook profiles and identity of users.[49] Facebook, itself, explains that these, and/or other "customer information parameters[,]" are ultimately "matched to Meta accounts."[50] In this way, the "cookie[s] identif[y] browsers for the purposes of providing advertising and site analytics services[.]."[51]

www.facebook.com
GET
/tr/?
id=391474022466070&ev=Purchase&dl=https%3A%2F%2Fbookings.travelclick.com%2F104015%3F_ga%3D2.168813352.86808335.1720406407-1132846831.1720236930%26Adults%3D1%26DateIn%3D08%2F13%2F2024%26DateOut%3D08%2F14%2F2024%26domain%3Dwww.godfreyhotelhollywood.com%26hotelId%3D104015%26languageid%3D1%26Rooms%3D1%23%2Fconfirmation&rl=https%3A%2F%2Fwww.godfreyhotelhollywood.com%2F&if=false&ts=1720531546798&cd[content_type]=hotel&cd[checkin_date]=2024-08-13&cd[checkout_date]=2024-08-14&cd[custom_param13]=The%20Godfrey%20Hotel%20Hollywood&cd[custom_param7]=1&cd[custom_param8]=King&cd[content_ids]=%5B%22104015%22%5D&cd[custom_param6]=1&cd[value]=242.25&cd[purchase_value]=242.25&cd[currency]=&cd[purchase_currency]=&cd[custom_param2]=892562860&cd[custom_param9]=undefined&cd[custom_param1]=&sw=1600&sh=1067&v=2.9.160&r=stable&ec=14&o=4126&fbp=fb.1.1720237192253.792968880823719468&ler=other&it=1720530752826&coo=false&tm=2&cdl=&rqm=GET
https
image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8
gzip, deflate, br, zstd
en-US,en;q=0.9
sb=h9WCZqatviXVCm_wXMDL42Jl; datr=h9WCZnuMq3rUaBLLpzpNnivS; ps_n=1; dpr=1.5;
c_user=61560564045991;

[49] Id.
[50] FACEBOOK, ABOUT EVENT MATCH QUALITY, https://www.facebook.com/business/help/765081237991954.
[51] FACEBOOK, COOKIES POLICY, https://www.facebook.com/policy/cookies/.

24

90.     As the screenshot above demonstrates, Defendants' Pixel sent the user's communications, and the guest records contained therein, alongside the user's Facebook ID (the "c_user" highlighted on the last line in the image above), thereby allowing the user's communications and actions on the website to be linked to their specific Facebook profile.

91.     A user's Facebook ID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook ID uniquely identifies an individual's Facebook account, Facebook—or any ordinary person—can easily use the Facebook Profile ID to quickly and easily locate, access, and view the user's corresponding Facebook profile. To find the Facebook account associated with a c_user cookie, one simply needs to type www.facebook.com/ followed by the c_user ID numeric value.

92.     These cookies are used to pair event data with personally identifiable information so that companies can later retarget consumers on Facebook.

93.     Defendants knowingly disclose information sufficiently permitting an ordinary person to identify a specific individual's website activity, including what webpages they visit, what items they view and purchase, and their "guest information."

**D.     Defendants' Tracking Tools Disseminate Customer Information to Google**

94.     Plaintiff's counsels' investigation revealed that Defendants were also sending their customers' protected health information to Google via Google tracking tools including Google Analytics and Google Tag Manager.

CLASS ACTION COMPLAINT

95.   Google Tracking Tools installed on the Web Properties appear to collect the same types and categories of sensitive Private Information from Defendants' customers as the Facebook Pixel:



```
▼Query String Parameters    view source    view URL-encoded
   random: 1722576484991
   cv: 11
   fst: 1722576484991
   bg: ffffff
   guid: ON
   async: 1
   gtm: 45be47v0v9138828916za200
   gcd: 13l3l3l3l1
   dma: 0
   tag_exp: 95250752
   u_w: 1600
   u_h: 1067
   url: https://bookings.travelclick.com/104015?_ga=2.175004458.967491335.1722576452-1889482986.172257
   6452&Adults=1&DateIn=08/02/2024&DateOut=08/03/2024&domain=www.godfreyhotelhollywood.com&hotelId=10
   4015&languageid=1&Rooms=1
   ref: https://www.godfreyhotelhollywood.com/
   hn: www.googleadservices.com
   frm: 0
   tiba: The Godfrey Hotel Hollywood
```

96. The image above demonstrates that Google Analytics similarly shares the name of the destination, the number of residents, the number of rooms, and the dates of stay.

97. As described *supra*, this information is shared with Google along with the CID, __ga and _gid cookies.

98. Defendants do not disclose that the Pixel, Google trackers, first-party cookies from third parties like Facebook and/or Google, or any other Tracking Tools embedded in the Web Properties' source code track, record, and transmit Plaintiff's and Class Members' Private Information to Facebook and Google for targeted advertising. Moreover, Defendants never received consent or written

CLASS ACTION COMPLAINT

authorization to disclose Plaintiff's and Class Members' private communications to Facebook or Google for marketing.

99.    Information sent to Google was sent alongside the Plaintiff's and Class Members' unique identifier ("_ga" or "CID" cookies), thereby allowing individual customers' communications with Defendants, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their identity.[52]

100.    Google logs a user's browsing activities on non-Google websites and uses this data for serving personalized ads.

**E.    Defendants Never Received Users' Consent to Disclose their Confidential Communications**

101.    As enabled by Defendants, the Tracking Tools collect the contents of Californians' communications with the Web Properties using the Facebook Pixel and Google Analytics. These communications include, but are not limited to, "guest information." This is information that is affirmatively entered by users into the Web Properties. This information is not anonymized because Defendants enable Facebook to link users' communications with their Facebook IDs, which reveal their identities. Google likewise uses cookies to link users to their unique Google accounts.

102.    Crucially, neither Defendants nor Facebook or Google procure prior consent from Californians for Facebook to engage in this wiretapping.

103.    The Godfrey Hotel Hollywood's "Privacy Policy" states: "We collect no information about you, other than information automatically collected and stored when you visit our site, including: [t]he name of the domain you use to access the Internet (e.g.aol.com, if you are using an American Online Account),

---

[52] *See Brown v. Google LLC*, 2023 WL 5029899, at fn. 11, *supra*, note 3 (quoting Google employee deposition testimony explaining how Google tracks user data).

**CLASS ACTION COMPLAINT**

[t]he date and time of your visit, [t]he pages you visited, and [t]he address of the web site you came from when you came to visit."[53]

104.   Additionally, its "Privacy Policy" reads: "We use this information for statistical purposes and to help us make our site more useful to visitors. Unless it is specifically stated otherwise, no additional information will be collected about you."[54]

105.   But, contrary to the disclosures, Defendants do collect and disclose users' personal information, including the Facebook ID that identifies the specific user. Defendants do not disclose that they collect and allow Facebook and Google and other third parties to intercept specific guest record information including the dates of the reservation, the number of adults and children, the cost of the room, and the type of room.

106.   Defendants also disclose that a room has been purchased and the hotel where users are staying—all of which is sensitive personal information that Defendants do not disclose that they collect and do not disclose that they are sharing this guest record information or personal information to third parties such as Facebook and Google.[55]

107.   As courts across the country have recognized, the identifiers that the Facebook Pixel captures—including the user's Facebook ID—constitute "directly personal information." By capturing information anyway, Defendants fail to receive consent from visitors to intercept their communications.

108.   Likewise, Defendants and Facebook or Google never receive consent from Web Properties users to intercept and collect electronic communications

---

[53] THE GODFREY HOTEL HOLLYWOOD, PRIVACY POLICY, https://www.godfreyhotelhollywood.com/privacy-policy.html.
[54] *Id.*
[55] The disclosure of the guest record information and the personally identifiable information is substantively different than sharing the page a user visits.

CLASS ACTION COMPLAINT

containing their sensitive and unlawfully disclosed information. In fact, Facebook expressly warrants the opposite.

109. Finally, none of the users agree to be bound by Defendants' privacy policy nor do Defendants obtain consent before disclosing users' personal information.

110. When signing up for Facebook, a user assents to three agreements: the Facebook Terms of Service,[56] the Cookies Policy,[57] and the Privacy Policy.[58] For California residents, Facebook also publishes a United States Regional Privacy Notice.[59]

111. Facebook's Terms of Service being by stating that "[p]rotecting people's privacy is central to how we've designed our ad system.[60] The Terms of Service then prohibit anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent[.]"[61]

112. Specifically, Facebook acknowledges that "[w]e collect and receive information from partners, . . . [and] receive this information whether or not you're logged in or have an account on our Products."[62]

113. Facebook then offers an express representation: "We require partners to have the rights to collect, use and share your information before giving it to

---

[56] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[57] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[58] FACEBOOK, PRIVACY POLICY, https://www.facebook.com/privacy/policy. *See also* https://mbasic.facebook.com/privacy/policy/printable.

[59] FACEBOOK, PRIVACY POLICY, https://facebook.com/privacy/policy. *See also* https://mbasic.facebook.com/privacy/policy/printable/.

[60] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[61] *Id.*

[62] *Id.*

CLASS ACTION COMPLAINT

us."[63] Facebook also acknowledges collecting "information with special protections[,]" meaning information that "could have special protections under the laws of your jurisdiction[,]" but critically, only sensitive information that users "choose to provide."[64]

114.  Facebook's Cookies Policy ratifies those representations, stating "the Privacy Policy will apply to our processing of the data that we collect via cookies."[65]

115.  For California residents, Facebook reiterates that policy: "We require each of these partners to have rights to collect, use, and disclose your information before providing any information to us."[66] The United States Regional Privacy Notice also restricts Facebook's ability to collect "sensitive personal information," stating they "will only use or disclose it either with your specific consent when required, or as otherwise permitted by law, including CCPA."[67]

116.  Facebook's other representations reinforce these warranties. In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[68]

117.  And in a blog post titled "About Restricted Meta Business Tools Dats." Facebook asserts it has "policies around the kinds of information businesses can share with us."[69] Facebook does not "want websites or apps

---

[63] *Id.*

[64] *Id.*

[65] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://facebook.com/policies/cookies/.

[66] FACEBOOK, UNITED STATES REGIONAL PRIVACY NOTICES, https://www.facebook.com/privacy/policy/uso/.

[67] *Id.*

[68] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

[69] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/361948878201809?id=18885272611056

CLASS ACTION COMPLAINT

sending us certain restricted information about people."[70] Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[71]

118.  These representations are repeated frequently. Facebook created a "Help Center" to better explain its practices to users.

119.  In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[72]

120.  In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[73]

121.  A reasonable user who reads Facebook's terms and representations would understand those terms as requiring Facebook to enforce an advertiser's compliance with its terms. At a minimum, those terms and representations require Facebook to build safeguards for sensitive information.

---

5.
[70] *Id.*
[71] *Id.*
[72] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGAINZATIONS, https://www.facebook.com/help/2230503797265156.
[73] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830.

CLASS ACTION COMPLAINT

122.   No reasonable user would read those terms and representations as permitting Facebook to intentionally intercept electronic communications that it knows the law protects and deems sensitive.

123.   And no user, reasonable or not, could read those terms as allowing Facebook to aid and abet another party's disclosure of such protected and sensitive information.

124.   In short, Facebook never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

## **TOLLING**

125.   Any applicable statute of limitations has been tolled by the "delayed discovery" rule.

126.   Plaintiff did not know (and had no way of knowing) that her Private Information was intercepted and unlawfully disclosed because Defendants kept this information secret.

127.   Plaintiff only discovered that her Private Information had been disclosed by Defendants in May 2024, when she discussed her experience with Defendants with undersigned counsel.

## **CLASS ACTION ALLEGATIONS**

128.   Class Definition**:** Pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of herself and other similarly situated individuals (the "California Class"), as defined below.

> All individuals residing in the State of California whose Guest Record Information was disclosed through the third-party Tracking Tools on Defendants' Web Properties.

CLASS ACTION COMPLAINT

129.   Plaintiff reserves the right to modify the class definition or add sub-classes as necessary prior to filing a motion for class certification.

130.   The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

131.   Excluded from the Class are Defendants; any affiliate, parent, or subsidiary of Defendants; any entity in which Defendants have a controlling interest; any officer director, or employee of Defendants; any successor or assign of Defendants; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

132.   <u>Numerosity/Ascertainability.</u> Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendants' records and non-party Facebook's and Google's records.

133.   <u>Typicality.</u> Plaintiff's claims are typical of the claims of the Class because Plaintiff used the Web Properties and had her personally identifiable information and protected health information disclosed to Facebook and/or Google without their express written authorization or knowledge. Plaintiff's claims are based on the same legal theories as the claims of other Class Members.

134.   <u>Adequacy.</u> Plaintiff is fully prepared to take all necessary steps to represent fairly and adequately the interests of the Class Members. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class Members. Plaintiff is represented by attorneys with experience in the prosecution of class

CLASS ACTION COMPLAINT

action litigation generally and in the emerging field of digital privacy litigation specifically. Plaintiff's attorneys are committed to vigorously prosecuting this action on behalf of the Class.

135. <u>Common Questions of Law and Fact Predominate/Well-Defined Community of Interest.</u> Questions of law and fact common to the Class predominate over questions that may affect only individual Class Members because Defendants have acted on grounds generally applicable to the Class. Such generally applicable conduct is inherent in Defendants' wrongful conduct. The following questions of law and fact are common to the Class:

    a. Whether and to what extent Defendants had a duty to protect the Plaintiff's and Class Members' guest records;

    b. Whether Defendants had duties not to disclose Plaintiff's and Class Members' information to unauthorized third parties;

    c. Whether Defendants violated its privacy policy by disclosing Plaintiff's and Class Members' information to Facebook, Meta, Google, or other third parties;

    d. Whether Defendants adequately, promptly and accurately informed Plaintiff and Class Members that their Private Information would be disclosed to third parties;

    e. Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

    f. Whether Defendants adequately addressed and fixed the practices which permitted the disclosure of patient Private Information;

    g. Whether Defendants knowingly made false representations as to its privacy policy practices;

CLASS ACTION COMPLAINT

h.  Whether Defendants knowingly omitted material representations with respect to its data security and/or privacy policy practices;

i.  Whether Defendants' acts and practices violated Plaintiff's and Class Members' privacy rights;

j.  Whether Plaintiff and Class Members are entitled to actual, consequential or nominal damages as a result of Defendants' wrongful conduct;

k.  Whether Defendants knowingly made false representations as to their data security and/or privacy policy practices;

l.  Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices;

m.  Whether Plaintiff and Class Members are entitled to damages under CIPA;

n.  Whether Defendants' actions violate Plaintiff's and Class Members' privacy rights as provided by the California Constitution; and

o.  Whether Defendants violated CIPA §§ 631 and 632

136.  <u>Superiority.</u> Class action treatment is a superior method for the fair and efficient adjudication of the controversy. Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweighs potential difficulties

CLASS ACTION COMPLAINT

in management of this class action. Plaintiff is unaware of any special difficulty to be encountered in litigating this action that would preclude its maintenance as a class action.

## COUNT I

### VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY ACT
#### Cal. Penal Code § 631(a)
#### (*On behalf of Plaintiff & the California Class*)

137.   Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

138.   Plaintiff brings this Count individually and on behalf of the members of the California Class.

139.   CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

Intentionally taps, or makes an unauthorized connection, whether physically, electronically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument including the wire, line, cable, or instrument of any internal telephonic communication system

*Or*

Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,

*Or*

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained

*Or*

CLASS ACTION COMPLAINT

Aids, agrees with, employs or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above this section.

140.    CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

141.    Facebook's Business Tools, including but not limited to the Facebook Pixel and the Conversions API, as well as Google's Analytics and Google Tracking Tools are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

142.    Facebook and Google are each a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).

143.    Further, Facebook and Google had the capability to use the wiretapped information for its own purposes. Accordingly, Facebook and Google were a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other. *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

144.    At all relevant times, Facebook and Google willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendants, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

CLASS ACTION COMPLAINT

145.   At all relevant times, Facebook and Google read, attempted to read, and/or learned the contents or meaning of the electronic communications of Plaintiff and then used or attempted to use the communications intercepted by its Business Tools to promote and improve its advertising platform, including to send direct targeted advertising to Plaintiff and Class Members.

146.   At all relevant times, Defendants aided, agreed with, employed, permitted, or otherwise enabled Facebook and Google to wiretap Plaintiff and Class Members using the Business Tools and to accomplish the wrongful conduct at issue here.

147.   Defendants intercepted and aided Facebook and Google in the interception of "contents" of Plaintiff's communications in at least the following forms:

    a.   The parties to the communications;

    b.   Personally identifying information such as customers' IP addresses, Facebook IDs, Google unique IDs, browser fingerprints, and other unique identifiers;

    c.   The hotel where the guest is staying;

    d.   The exact dates of that stay;

    e.   How many adults and how many children are staying in the room;

    f.   The type of room they are staying in;

    g.   The cost of the room where they are staying;

    h.   The fact that the room was purchased; and

    i.   Any other content that Defendants have aided third parties such as Facebook in scraping from webpages or communication forms at Web Properties.

148.   Plaintiff and Class Members did not provide their prior consent to Facebook and Google's intentional access, interception, reading, learning,

CLASS ACTION COMPLAINT

recording, collection, and usage of Plaintiff's and Class Members' electronic communications.

149. Nor did Plaintiff and Class Members provide their prior consent to Defendants aiding, agreeing with, employing, permitting, or otherwise enabling Facebook's conduct.

150. The violation of section 631(a) constitutes an invasion of privacy sufficient to confer Article III standing.

151. The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Web Properties and where Facebook and Google—as enabled by Defendants—routed Plaintiff's and Class Members' electronic communications its servers.

152. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendants' violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 631(a).

## COUNT II

**VIOLATION OF THE CALIFORNIA INVASION OF PRIVACY AC
Cal. Penal Code § 632
(*On behalf of Plaintiff & the California Class*)**

153. Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

154. Plaintiff brings this Count individually and on behalf of the members of the California Class.

155. CIPA § 632(a) prohibits any entity from:

> intentionally and without consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, or other device, except a radio.

CLASS ACTION COMPLAINT

156.    Facebook's Business Tools, including but not limited to the Facebook Pixel and the Conversions API, are "electronic amplifying or recording device[s]."

157.    Cal. Civ. Code § 53.5(a) states:

[A]n innkeeper, hotelkeeper, motelkeeper, lodginghouse keeper, or owner or operator of an inn, hotel, motel, lodginghouse, or other similar accommodations, or any employee or agent thereof, who offers or accepts payment for rooms, sleeping accommodations, or board and lodging, or other similar accommodation, shall not disclose, produce, provide, release, transfer, disseminate, or otherwise communicate, except to a California peace officer, all or any part of a guest record orally, in writing, or by electronic or any other means to a third party without a court-issued subpoena, warrant, or order.

158.    Per Cal. Civil. Code § 53.5(c):

"Guest record" for purposes of this section includes any record that identifies an individual guest, boarder, occupant, lodger, customer, or invitee, including, but not limited to, their name, social security number or other unique identifying number, date of birth, location of birth, address, telephone number, driver's license number, other official form of identification, credit card number, or automobile plate number.

159.    Here, Web Properties users' communications with Defendants—made while browsing and booking a room at the Godfrey Hotel Hollywood via the Web Properties —contain sensitive and confidential "guest records." First, the communications include "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c). Further, the Facebook Pixel compels Web Properties users' browsers to transmit several cookies (including the c_user, datr, fr, and _fbp cookies) containing "unique identifying number[s]" assigned to Web Properties users. Likewise, the Google Tracking Tools installed and configured by Defendants transmitted through cookies ("_ga" or "CID") Plaintiff's and Class Members' unique identifiers, thereby allowing individual patients' communications with Defendants, and the Private Information contained in those communications, to be linked to their unique Google accounts and therefore their

CLASS ACTION COMPLAINT

identity.Cal. Civil Code § 53.5(c). These communications are all "record[s] that identif[y] an individual[.]" Cal. Civil Code § 53.5(c).

160.   Web Properties users' communications with Defendants also "identif[y] an individual [as a Godfrey Hotel Hollywood] guest, boarder, occupant, lodger, customer, or invitee[.]" *Id.*

161.   Facebook and Google intercept Web Properties users' button clicks selecting the destination to which they wish to travel, the desired dates for their trip, the number of rooms they require, the type of room in which they will staying, and the cost of that room.

162.   These communications "identif[y] an individual [as a Godfrey Hotel Hollywood guest] guest, boarder, occupant, lodger, customer, or invitee" (Cal. Civil Code § 53.5(c)) because they show that all Web Properties users are "invitees" of The Godfrey Hotel Hollywood—individuals with "express or implied invitation to enter or use [The Godfrey Hotel Hollywood's] premises"[74] These communications also identify certain Web Properties users (those who complete the booking process) as The Godfrey Hotel Hollywood's "guests" and "customers."

163.   Thus, at all relevant times, Facebook and Google intentionally used their Tracking Tools to eavesdrop upon and record the confidential communications and personal information (including "guest records," which are confidential, under Cal. Civil Code § 53.5) of Plaintiff and Class Members, on the one hand, and Defendants, on the other.

164.   Moreover, neither Facebook nor Google is not permitted to obtain such information because it is not a legitimate "third-party service provider," as defined by Cal. Civil Code § 53.5(f). Facebook and Google are not "an entity

---

[74] INVITEE, Black's Law Dictionary (11th ed. 2019).

**CLASS ACTION COMPLAINT**

contracted to provide services outlined in [a] contract [with The Godfrey Hotel Hollywood's] that has no independent right to use or share the data beyond the terms of the contract." Rather, Facebook and Google have the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendants. *See infra* III.A. Therefore, Defendants' conduct here at issue was not permitted by Cal. Civil Code § 53.5(i).

165.    When communicating with Defendants, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on Cal. Civil Code § 53.5. Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendants would be on the other end of the communication, and that other, third-party entities like Facebook and Google, would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

166.    Plaintiff and Class Members did not consent to any of Facebook's or Google's actions. Nor have Plaintiff or Class Members consented to Facebook's or Google's intentional use of an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

167.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendants' violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendants' violations of CIPA § 632(a).

## **RELIEF REQUESTED**

168.    Plaintiff Madeline Dion, individually and on behalf of the proposed California Class, respectfully requests that the Court grant the following relief:

a.    Certification of this action as a class action and appointment of Plaintiff and Plaintiff's counsel to represent the Class;

b.    An order enjoining Defendants from engaging in the unlawful

CLASS ACTION COMPLAINT

practices and illegal acts described herein; and

    c.   An order awarding Plaintiff and the Class: (1) actual or statutory damages; (2) punitive damages in an amount to be determined at trial; (3) prejudgment interest on all amounts awarded; (4) injunctive relief as the Court may deem proper; (5) reasonable attorney fees and expenses and costs of suit pursuant to the California Code of Civil Procedure § 1021.5 and/or other applicable law; and (6) such other and further relief as the Court may deem appropriate.

## **DEMAND FOR JURY TRIAL**

Plaintiff Madeline Dion, on behalf of herself and the proposed Class, demands a trial by jury for all claims asserted herein and so triable.

DATED: August 2, 2024

                          /s/ Matthew J. Langley
                          Matthew J. Langley, (SBN 342846)
                          **ALMEIDA LAW GROUP LLC**
                          849 W. Webster Avenue
                          Chicago, Illinois 60614
                          t: 312-576-3024
                          matt@almeidalawgroup.com
                          *Attorney for Plaintiff & the Class*

CLASS ACTION COMPLAINT